# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian Thomas Hoyland, <br><br> Plaintiff, <br><br> v. <br><br> Shawn McMenomy, Henry Cho, Alex Eckstein, and Ryan Coughlin, and the City of Rosemount, <br><br> Defendants. | Case No. 14-cv-2977 (SRN/JSM) <br><br><br><br> **MEMORANDUM OPINION AND ORDER** |

Frederick J. Goetz, Goetz & Eckland PA, 615 1st Ave. NE, Ste. 425, Minneapolis, MN 55413, for Plaintiff.

Brian P. Taylor, Jason M. Hiveley, Jon K. Iverson, Iverson Reuvers Condon, 9321 Ensign Ave. S, Bloomington, MN 55438, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff Brian Hoyland's Motion for Partial Summary Judgment ("Pl.'s Mot.") [Doc. No. 22] and Defendants' Motion for Summary Judgment ("Defs.' Mot.") [Doc. No. 16].   A hearing on these Motions was held on December 11, 2015 at which time the Court made certain rulings and took the remaining portions of the Motions under advisement.[1]  (See Court Minutes dated 12/11/2015 [Doc. No. 42].)  This Order memorializes the Court's prior rulings and resolves the outstanding

---

[1] At the hearing, the Court also denied Defendants' Motion to Exclude Expert [Doc. No. 26].  (See Court Minutes dated 12/11/2015 [Doc. No. 42].)  The Court will issue a separate written order memorializing that ruling.

Motions.  For the reasons set forth below, Plaintiff's Motion is denied and Defendants' Motion is granted in part and denied in part.

## I.    INTRODUCTION

This suit stems from the arrest of Plaintiff Brian Hoyland ("Hoyland") by Rosemount police officers Shawn McMenomy ("McMenomy"), Henry Cho ("Cho"), Alex Eckstein ("Eckstein"), and Ryan Coughlin ("Coughlin") (collectively, "the Officers") on May 8, 2013.  Some of this incident was captured on video.  Although many material facts are undisputed, some material facts remain in dispute.  Moreover, the parties' perceptions of the events are quite different.  A jury must resolve these disputes, precluding summary judgment on most of Hoyland's claims.

## II.    BACKGROUND

### A.  The Traffic Incident

In the early morning hours of May 8, 2013, Rosemount police received a report of exhibition driving (i.e., drag racing).  (Aff. of Frederick J. Goetz ("Goetz Aff.") [Doc. No. 25], Ex. 4 ("McMenomy Depo.") at 39 [Doc. No. 25-4].[2])  Officers McMenomy and Eckstein responded to the scene in separate squad cars and observed a late model Corvette

---

[2] Hoyland's evidence was presented through exhibits attached to the Affidavit of Frederick J. Goetz [Doc. No. 25].  Defendants' evidence was presented through exhibits accompanying the Affidavit of Brian Taylor [Doc. No. 18].  Both parties provided similar evidence consisting primarily of the parties' depositions and videos from the Officers' dashboard cameras and Hoyland's cellphone.  For the sake of brevity, the Court cites to this overlapping evidence as it appears in the Goetz Affidavit.  The Court notes when it cites evidence provided in the Taylor Affidavit.  Additionally, when any deposition is cited, the pages referenced are those found in the deposition itself, not those assigned by ECF.

leaving the area.  (See McMenomy Depo. at 43; Goetz Aff., Ex. 6 ("Eckstein Depo.") at 25–27 [Doc. No. 25-6].)  Both Officers followed the Corvette and McMenomy ran the vehicle's license plate.  (McMenomy Depo. at 41; Eckstein Depo. at 28.)  McMenomy discovered the vehicle was registered to a Mark Illetschko ("Illetschko").  (McMenomy Depo. at 46.)  Illetschko did not have any outstanding warrants.  (Id.)  Illetschko was in fact the driver of the Corvette that night.  (Goetz Aff., Ex. 9 ("Illetschko Depo.") at 13 [Doc. No. 25-9].)

After following the Corvette for a short distance, McMenomy observed its tires "partially" cross the center dividing line.  (McMenomy Depo. at 48.)  McMenomy activated his emergency lights to initiate a traffic stop, but the vehicle did not immediately stop and instead turned left into a residential neighborhood.  (Id. at 48–49; see Goetz Aff., Ex. 1 ("Dashboard Videos"), McMenomy at 1:43:27–33[3].)  McMenomy sounded his siren several times, but the vehicle failed to stop and instead made another left hand turn.  (McMenomy Depo. at 49; see Dashboard Videos, McMenomy at 1:43:33–47.)  McMenomy claims that he witnessed the vehicle "visibly accelerate" and "determined that the vehicle was fleeing from [him]," at which point he turned on his siren and "continued to give chase."

---

[3] The dashboard cameras in the vehicles of Officers McMenomy, Eckstein, and Coughlin were all included as Exhibit 1 to the Goetz Affidavit.  No video or audio evidence from Officer Cho's squad was produced by either party.  The Court cites to Exhibit 1 generally as "Dashboard Videos," references a specific Officer's camera (e.g., McMenomy), and cites to the timestamp as it appears on the video itself.  Each camera recorded two views, one out the front of the vehicle and the other in the backseat.  The Court notes that the cameras have two audio streams, one from a microphone worn by the Officer, another from a microphone in the vehicle itself.  Unfortunately, Officer Coughlin's personal microphone was malfunctioning or shut off during various parts of the incident and only portions of his audio are available.  (See, e.g., Dashboard Videos, Coughlin at 00:55:25–1:01:09 (Coughlin's personal microphone appears to be turned off or cuts out completely); 1:18:13–17 (audio cutting in and out).)

(McMenomy Depo. at 49–50; see Dashboard Videos, McMenomy at 1:43:44–1:44:03.) However, within seconds, the vehicle pulled into the driveway of a house[4] and stopped. (McMenomy Depo. at 50; see Dashboard Videos, McMenomy at 1:44:03–07.) The entire chase, from the time McMenomy activated his emergency lights until the vehicle stopped in the driveway, lasted approximately 40 seconds, covered about a quarter of a mile, and never exceeded 40 miles per hour. (See Dashboard Videos, McMenomy at 1:43:27–1:44:07; McMenomy Depo. at 50.)

**B.  The Arrest**

Shortly after coming to a stop, Illetschko attempted to exit the vehicle. (McMenomy Depo. at 51.) McMenomy parked his squad car partially in the driveway, drew his service weapon, pointed it at Illetschko, and ordered Illetschko to remain in the vehicle, and Illetschko complied. (McMenomy Depo. at 50–51; see Dashboard Videos, McMenomy at 1:44:13–1:45:32.) At this same time, Officer Eckstein arrived on the scene and drew his service weapon, pointing it at the vehicle. (See Eckstein Depo. at 32.)

McMenomy gave Illetschko a series of commands (e.g., to put his hands up, to exit the vehicle, to walk backwards towards the squad cars, etc.) all of which Illetschko obeyed. (See McMenomy Depo. at 52; Eckstein Depo. at 33; Dashboard Videos, McMenomy at 1:44:13–1:45:32.) At no time did Illetschko resist, attempt to flee, or disobey the Officers' commands. (See McMenomy Depo. at 52; Eckstein Depo. at 33.) At about this same time, Officer Coughlin and then Sergeant Cho arrived on the scene. (Goetz Aff., Ex. 5 ("Cho

---

[4] Unbeknownst to the Officers at the time, the house at which the Corvette stopped was the residence of Plaintiff Hoyland and his wife, Christina Hoyland. (See Goetz Aff., Ex. 3 ("B. Hoyland Depo.") at 5–6 [Doc. No. 25-3].)

Depo.") at 51–52 [Doc. No. 25-5], Ex. 7 ("Coughlin Depo.") at 47 [Doc. No. 25-7]; see Dashboard Videos, Coughlin at 00:46:27–00:47:00.)  Officer Coughlin took Illetschko into custody, searched him, handcuffed him, and placed him in the back of a squad car, all without incident.[5]  (Coughlin Depo. at 47–48; Cho Depo. at 53–54; see Dashboard Videos, Coughlin at 00:46:27–00:48:21.)

Christina Hoyland ("Christina"), Plaintiff Hoyland's wife, was a passenger in the Corvette.  (Goetz Aff., Ex. 8 ("C. Hoyland Depo.") at 6, 11–16.)  The Officers ordered Christina to keep her hands in the air and exit the vehicle.  (See McMenomy Depo. at 56; Eckstein Depo. at 34; Coughlin Depo. at 53; Cho Depo. at 54–55; Dashboard Videos, McMenomy at 1:47:15–26, Coughlin at 00:46:27–00:47:25.)  The parties dispute how compliant Christina was with the Officers' commands.  (See McMenomy Depo. at 56–57 (describing Christina as initially non-compliant and yelling profanities, but stating that she eventually put her hands in the air and became compliant); Eckstein Depo. at 34–35 (describing Christina as using profanities, but being compliant for the most part); Coughlin Depo. at 53–54, 67–68; Cho Depo. at 54–55; C. Hoyland Depo. at 15–16, 18–19 (describing herself as compliant with the Officers' commands to keep her hands up, but admitting to directing profanity at them).)  The video evidence shows that Christina by-and-large

---

[5] The video evidence shows that Illetschko was searched and in handcuffs, standing with Coughlin next to the squad cars, when Hoyland emerged from the house.  (See Dashboard Videos, McMenomy at 1:46:58–1:47:26, Coughlin at 00:47:25–00:48:09.)  Coughlin placed Illetschko in the back of a squad car while McMenomy and Cho moved in to arrest Hoyland.  (See Dashboard Videos, McMenomy at 1:46:58–1:47:26, Coughlin at 00:48:00–21).  Defendants agree that Hoyland's emergence from the house did not prevent or otherwise interfere with Coughlin's ability to detain Illetschko.  (See Coughlin Depo. at 50; McMenomy Depo. at 59–60; Eckstein Depo. at 39–40.)

followed the Officers' commands, but did direct verbal criticism—including profanity—at them in the process. (See Dashboard Videos, McMenomy at 1:47:15–1:48:00, Coughlin at 00:46:27–00:48:09.) Christina was trying, at least in part, to communicate that she was physically disabled[6] in a way that prevented her from walking backwards in accordance with the Officers' commands. (C. Hoyland Depo. at 16–17; see Eckstein Depo. at 38 (describing Christina saying she was unable to walk backwards).) During this time, Eckstein noticed Hoyland briefly peer out of a window in the house. (Eckstein Depo. at 35–36; Goetz Aff., Ex. 3 ("B. Hoyland Depo.") at 50 [Doc. No. 25-3].)

Hoyland was awoken by the commotion and after observing police officers outside the front of his house, he moved his children into his bedroom at the back of the house. (B. Hoyland Depo. at 49–51.) Hoyland then retrieved his cellphone with the intent of filming the incident for "protection" because he feared for his family's safety. (See id. at 52–53.) He initially planned to record the incident from inside, but grew concerned for his wife's safety when he believed he heard the Officers use the word "shoot" or "shooting." (See id. at 54–55.) Hoyland claims he went outside to inform the Officers that his wife had a physical disability that prevented her from complying with their commands. (Id. at 56–57.)

Hoyland turned on his porch light and opened the front door holding his cellphone, which was recording, in front of him. (See B. Hoyland Depo. at 56; McMenomy Depo. at

---

[6] Christina suffers from paralysis in one of her legs that limits her mobility. (See C. Hoyland Depo. at 16; B. Hoyland Depo. at 47–48.)

65–67; Eckstein Depo. at 36–37; Goetz Aff., Ex. 2 ("Cellphone Video") at 00:00–12[7].)

Hoyland was approximately 30–40 feet away from the Officers, the vehicle, and Christina, standing in his doorway or just outside the doorway. (B. Hoyland Depo. at 58; McMenomy Depo. at 66.) All four Officers briefly shifted their attention to Hoyland when he emerged. (See B. Hoyland Depo. at 58 (describing the Officers turning and pointing their weapons at him); McMenomy Depo. at 66–67; Cho Depo. at 55–56; Eckstein Depo. at 40 (describing how he "very briefly" shifted his attention to Hoyland, but then returned to focusing on Christina); Coughlin Depo. at 49–51, 55–56 (describing noticing Hoyland in his peripheral vision, but focusing on Christina).) Some of the Officers allege that they could not immediately tell what was in Hoyland's hand(s) and worried it might be a weapon. (Cho Depo. at 68–69 (describing his fear that the object might be a weapon); McMenomy Depo. at 66–67, 81 (describing being initially unsure what the object was, but suspecting it was a cellphone or video camera within seconds).) However, within seconds of Hoyland emerging, one of the Officers repeatedly yelled, "Drop the camera!"[8] (Dashboard Videos, Coughlin at 00:47:30–40; Cellphone Video at 00:28–34.)

McMenomy shouted to Hoyland to go back inside the house. (McMenomy Depo. at 70; see Cellphone Video at 00:12–19.) He claims that initially this instruction was a

---

[7] Hoyland's Cellphone Video is approximately one minute and fifteen seconds long. Since the video contains no time stamps, the Court cites to specific time periods (e.g., 00:50–1:01).

[8] McMenomy believes Cho made this statement. (McMenomy Depo. at 104.) However, Cho does not remember whether he ordered Hoyland to drop the camera. (Cho. Depo. at 64–65.)

suggestion and not an order.  (McMenomy Depo. at 90.)  Hoyland remained in the doorway and shouted statements like, "You are on my lawn!" and "What is this, a DWI stop, and you guys are doing this?  Are you kidding me?"  (Cellphone Video at 00:20–28.)  Out of concern for his wife, he also shouted to the Officers that his wife was handicapped and demanded that they do their jobs "the right way."  (Id. at 00:28–34.)

Because Hoyland did not go back inside his home, McMenomy ordered Hoyland to "stay inside."[9]  (See McMenomy Depo. at 91–92.)  When Hoyland did not comply with McMenomy's order(s), "the arrest decision was made."  (Id. at 91.)  McMenomy told Hoyland he was under arrest and ordered him to raise his hands.  (Id. at 84–85; see Cellphone Video at 00:34–42.)  From the time Hoyland first opened his front door until McMenomy told him he was under arrest was approximately 30 seconds.  (See Cellphone Video at 00:12–42.)

Hoyland initially protested that he was not under arrest, repeatedly told the Officers that his wife was handicapped, and attempted to show the Officers he was unarmed.  (See id. at 00:34–56.)  During this time, Christina can be heard shouting that she is handicapped. (See id. at 00:38–56.)  Hoyland was instructed to raise his hands and lay down on the ground, and he was taken into custody by McMenomy and Cho without incident.  (See McMenomy Depo. at 70–71; Cho Depo. at 77; Cellphone Video at 00:40–1:10; Dashboard Videos, McMenomy at 1:47:46–1:49:45.)  Shortly thereafter, Christina, who was standing

---

[9] It is not entirely clear how or when McMenomy's instructions to Hoyland changed from suggestions to orders.  (See McMenomy Depo. at 91–92 (describing the difference being the "actual words [he] used," first suggesting Hoyland "go back inside" and then ordering that Hoyland "stay inside").)

8

next to the vehicle the entire time, was taken into custody by Eckstein and Coughlin without incident.  (See Cho. Depo. at 77; Eckstein Depo. at 46; Dashboard Videos, McMenomy at 1:49:45–59.)

The entire incident, from the moment when Hoyland emerged from his home to the moment he and Christina were under arrest in the Officers' physical custody, lasted approximately two minutes and twenty seconds.  (See Dashboard Videos, McMenomy at 1:47:26–1:49:49.)  Hoyland never left the area of his front door, never told Christina to resist or otherwise disobey the Officers' commands, and never resisted, fled from, or otherwise attempted to physically intervene with the Officers himself.  (See McMenomy Depo. at 71, 87; Cho Depo. at 66–68; Eckstein Depo. at 45–46; Coughlin Depo. at 62–63, 66–67; Cellphone Video; Dashboard Videos, McMenomy at 1:47:26–1:49:45, Coughlin at 00:47:25–00:49:44.)  However, the Officers argue that the fact that Hoyland opened his front door, held his cellphone, verbally interacted with them about his wife's disability, and refused to go inside when instructed, interfered with their duties by requiring them to focus their attention on him and not Christina.  (See McMenomy Depo. at 65–66, 70–71; Cho Depo. at 71–72; Coughlin Depo. at 61–62.)

### C.  The Charge Against Hoyland and Its Subsequent Dismissal

Shortly after being taken into custody, Hoyland was placed in the back of McMenomy's squad car and one of the Officers spoke to him.[10]  (See Dashboard Videos, McMenomy at 2:00:40–2:01:12.)  Hoyland explained again that his purpose in coming

---

[10] It is not clear from the video which Officer spoke with Hoyland at this time.

outside was to inform the Officers of his wife's disability.  (See id.)  The Officer replied, in part, "Well that is very different than coming out and videotaping us and disobeying a lawful order of going back inside."  (See id.)

Hoyland was subsequently placed in the back of Eckstein's squad car and Eckstein issued him a citation for obstruction of legal process.  (Eckstein Depo. at 47–48; Dashboard Videos, Eckstein at 2:23:23–2:34:40.)  Eckstein issued the citation on the instruction of Cho and Coughlin, not because he personally witnessed anything he believed constituted obstruction.[11]  (See Eckstein Depo. at 48.)  McMenomy, Cho, and Coughlin were all involved in the decision to charge Hoyland with obstruction.  (McMenomy Depo. at 95–96; Coughlin Depo. at 73–74; Cho Depo. at 74–75.)

Eckstein informed Hoyland that he was being charged with obstruction for failing to obey the Officers' commands and distracting them from their duties.  (See Dashboard Videos, Eckstein at 2:33:10–2:34:40.)  Hoyland told Eckstein that he had been a police officer and would have done the same thing.[12]  (See id.)  He also stated he understood the severity of the situation, but "was not thinking very well," and probably made the situation worse for the Officers.  (See id. at 2:32:50–2:33:03, 2:38:00–30.)  However, Hoyland repeatedly told Eckstein that he came outside due to his concern for his wife and to inform

---

[11] Except for a brief moment when Hoyland first emerged from the house, Eckstein's attention remained on Christina.  (Eckstein Depo. at 40.)  However, Defendants now point to a statement by Eckstein to Hoyland explaining that he could not hear what Christina was saying because of Hoyland's conduct, implying that this constituted an interference with Eckstein's duties.  (See Defs.' Mem. in Opp. at 8, n.2 [Doc. No. 32] (citing Dashboard Videos, Eckstein at 2:33:10–2:34:40.).)

[12] Hoyland served for a time as a military police officer.  (B. Hoyland Depo. at 12, 14–15.)

the Officers of her disability.   (See id. at 2:28:03–34, 2:29:46–2:30:16, 2:34:00–40.)

Defendants claim that Hoyland later stated that it was his intent that senior officer Cho

"intercede" with the actions of the other Officers when Hoyland told Cho to come over to

him.[13]   (See Defs.' Mem. in Opp. at 9 [Doc. No. 32].)

Eckstein explained to Hoyland that from the Officers' standpoint, Hoyland had

emerged from the house holding an unidentified object in his hand, disobeyed their orders to

go back inside, and in the process distracted them from the vehicle and its passenger.  (See

Dashboard Videos, Eckstein at 2:33:10–2:34:00.)  Later, after Hoyland was released from

his handcuffs and let out of the squad car, one of the Officers told him that he had made an

already dangerous situation (i.e., the stop) worse by coming outside.[14]   (See id. 2:45:10–

2:46:44.)  However, the Officer clarified that, had Hoyland filmed the Officers "walking

down the street" that would be fine, but "when you are in the middle of it, that's way too

tight for us."  (See id.)

Hoyland subsequently challenged the obstruction charge against him in Dakota

County District Court, arguing that the Officers lacked probable cause to arrest him.  (See

---

[13] Defendants refer to Hoyland's deposition where he comments on a portion of his cellphone video where he says, "Get over here and do your job the right way!"  (See B. Hoyland Depo. at 86–87; Cellphone Video at 00:28–34.)  Hoyland testified that he made that statement because he "wanted [Cho] to go and intercede because the two officers who were initially handling the situation, looked to me to be unsure and inexperienced."  (B. Hoyland Depo. at 86–87.)

[14] This discussion took place off camera and thus the Court cannot say with certainty which Officer made these statements.

Goetz Aff., Ex. 11 ("Dakota County Court Order") at 10[15] [Doc. No. 25-11].)  Judge Arlene

M. Asencio Perkkio ("Judge Perkkio") found that the Officers lacked probable cause and

dismissed the charge against Hoyland.  (Dakota County Court Order at 8.)  After reviewing

the record and the standard for obstruction of legal process under Minn. Stat. § 609.50,

subd. 1(2), Judge Perkkio held that:

> [Hoyland's] actions did not constitute the crime of Obstruction of Legal
> Process.  It is clear from the video recording obtained from [Hoyland's] cell
> phone that [Hoyland] exited his residence with the sole intent to inform
> officers his wife was disabled and unable to comply with their commands,
> and to record the incident for possible future use as evidence if the officers
> engaged in any improper conduct.  The recording also shows that within
> seconds of [Hoyland's] exiting the residence, the officers were aware the
> object he held was a camera.  The entire encounter with [Hoyland] lasted
> approximately  one  minute,  during  which  time  [Hoyland]  consistently
> attempted  to  communicate  his  wife  was  disabled.   [Hoyland's]  conduct
> amounted  to  nothing  more  than  a  fleeting  interruption  of  the  officers'
> performance of their duties without any intent to cause such an interruption.
> Accordingly, there is not probable cause to sustain the charge and the charge
> is dismissed.

(Id. at 10.)

**D.  Procedural Background**

Based on the facts above, Hoyland brought claims against McMenomy, Cho, and

Eckstein pursuant to 42 U.S.C. § 1983 for unreasonable seizure, (Compl., Count I at ¶¶ 36–

38 [Doc. No. 1]), and violation of his First Amendment rights, (id., Count II at ¶¶ 39–43), as

well as a state law claim for malicious prosecution, (id., Count V at ¶¶ 48–51).  Hoyland

---

[15] The Court cites to the page numbers as they appear within this document, not to the
ECF page numbers.

also brought a § 1983 claim against Coughlin for an unreasonable search.[16]  (Id., Count III at ¶¶ 44–46.)

Hoyland seeks partial summary judgment as to liability on his unreasonable seizure claim (Count I).  (See Pl.'s Mot.)  He provided a memorandum of law and reply in support of this Motion.  (Pl.'s Mem. in Supp. [Doc. No. 24]; Pl.'s Reply [Doc. No. 40].)  Defendants oppose Hoyland's Motion.  (Defs.' Mem. in Opp. [Doc. No. 32].)

Defendants also seek summary judgment dismissing all of Hoyland's claims.  (Defs.' Mot.)  They filed a memorandum of law and reply in support of that Motion.  (Defs.' Summary Judgment Mem. of Law ("Defs.' Mem. in Supp.") [Doc. No. 19]; Defs.' Reply [Doc. No. 39].)  Hoyland opposes Defendants' Motion with one exception.  (See Pl.'s Mem. in Opp. [Doc. No. 36].)  Hoyland does not oppose dismissing his § 1983 claim for unreasonable search against Coughlin, and since this is the only claim asserted against Coughlin, Coughlin is hereby dismissed.  (See Pl.'s Mem. in Opp. at 2, n.1 and 27.)  The Court addresses the remaining issues raised by the parties below.

## III.   DISCUSSION

### A.  Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

---

[16]  Hoyland initially claimed that Coughlin illegally entered and searched his home without a warrant or circumstances allowing for an exception to the general warrant requirement.  (Compl., Count III at ¶¶ 44–45.)  As discussed later, Hoyland does not oppose dismissal of this claim and Coughlin as a defendant.

477 U.S. 317, 322–23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  <u>Id.</u> at 323.  Summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Id.</u> at 322.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 256.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Id.</u> at 248.

### B.  Hoyland's Section 1983 Unreasonable Seizure Claim

Hoyland seeks summary judgment on liability for his § 1983 unreasonable seizure claim against McMenomy, Eckstein, and Cho.  (<u>See</u> Pl.'s Mot.)  In support, he argues that the Officers are not entitled to qualified immunity because his Fourth Amendment right to be free from unreasonable seizure was well-established at the time of his arrest and the Officers lacked arguable probable cause to arrest him for obstruction.  (<u>See</u> Pl.'s Mem. in Supp. at 24–33.)  More specifically, Hoyland contends that none of his conduct

14

interfered with the Officers' performance of their duties—a requirement for an arrest for obstruction.  (See id. at 29–33.)

Conversely, the Officers seek summary judgment dismissing Hoyland's § 1983 unreasonable seizure claim.  (See Defs.' Mot.)  The Officers claim they are entitled to qualified immunity against Hoyland's claim because the Officers had arguable probable cause to arrest Hoyland for obstruction.  (See Defs.' Mem. in Supp. at 10–14.)  They argue that Hoyland's actions did not merely interrupt them, but rather "substantially frustrated the performance of [their] duties . . . ."  (See Defs.' Mem. in Opp. at 12–14.)  Even if they lacked arguable probable cause, Defendants contend that Hoyland's right to "insert himself within 30 feet of a high risk stop," and "converse with officers while conducting a traffic stop," was not clearly established at the time of Hoyland's arrest, entitling the Officers to qualified immunity.  (See id. at 17–20.)

In assessing these cross motions for summary judgment, the Court views the facts and evidence in the light most favorable to the non-moving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).  However, for the reasons described below, disputed material facts prevent the Court from granting either motion.

The Court must first examine whether the Officers are entitled to qualified immunity against Hoyland's § 1983 unreasonable seizure claim.  Qualified immunity protects government officers from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009).  Courts perform a two-part analysis to determine if qualified immunity applies by

determining: (1) whether the facts show the violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged misconduct.[17]

Saucier v. Katz, 533 U.S. 194, 201 (2001); see Brown, 574 F.3d at 496.

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotations and citations omitted).  "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 194–95.

The Fourth Amendment right to be free from unlawful arrest was clearly established at the time of Hoyland's arrest.[18]  See Baribeau v. City of Minneapolis, 596 F.3d 465, 478 (8th Cir. 2010) ("It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment."). Thus, the Court considers whether the facts, taken in the light most favorable to the non-moving party, establish a violation of that right.  More specifically, the Court assesses whether the

---

[17] Courts may address the prongs of the qualified immunity analysis in whatever order they deem appropriate based on the circumstances of the case.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

[18] Defendants' attempt to characterize the right at issue as the right to "insert [oneself] within 30 feet of a high risk stop," and "converse with officers while conducting a traffic stop," misunderstands Hoyland's claim.  Hoyland's § 1983 unreasonable seizure claim plainly alleges that his Fourth Amendment right to be free from unlawful arrest was violated when the Officers arrested him for obstruction of legal process without arguable probable cause.  (Compl., Count I at ¶ 36.)

16

undisputed facts show that the Officers had, or lacked, the arguable probable cause necessary for qualified immunity.[19]

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Ulrich v. Pope County, 715 F.3d 1054, 1059 (8th Cir. 2013) (quotations omitted). Where the totality of the circumstances at the time of an arrest would allow a reasonable officer to believe the suspect had or was committing a crime, there is probable cause. Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." Ulrich, 715 F.3d at 1059 (quotations omitted).

In formulating probable cause, officers necessarily receive "substantial latitude in interpreting and drawing inferences from factual circumstances." United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997) (quotations omitted). However, this latitude is subject to at least one important limitation:

> [B]ecause the *totality* of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. In this sense, the Fourth

---

[19] Qualified immunity is a question of law for the Court, not an issue for the jury. See Littrell v. Franklin, 388 F.3d 578, 584 (8th Cir. 2004). "The issue of qualified immunity, however, is frequently intertwined with unresolved factual questions." Id. at 585. Under such circumstances, a court may put specific factual interrogatories to the jury and then rely upon the jury's factual findings to make a qualified immunity ruling. Id.

> Amendment requires that we analyze the weight of all the evidence—not
> merely the sufficiency of the incriminating evidence . . . .

Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (citations omitted).  Here, whether the

Officers had arguable probable cause to arrest Hoyland[20] depends in part on Minnesota's

legal standard for obstruction.

In relevant part, the crime of obstruction requires that an individual intentionally

obstruct, resist, or interfere with a police officer while the officer is performing his/her

official duties.  Minn. Stat. § 609.50, subd. 1(2).  While addressing a due process

challenge to the obstruction statute, the Minnesota Supreme Court made several

important observations about the statute's breadth.  See State v. Krawsky, 426 N.W.2d

875 (Minn. 1988).  First, the Court noted that an individual must intentionally interfere to

be guilty of obstruction.  Id. at 877.  Second, the Court clarified that the interference

required "involves not merely interrupting an officer but substantially frustrating or

hindering the officer in the performance of his duties."  Id.  Third, the Court interpreted

the statute as being "directed solely at physical acts," but went on to explain:

> The statute may be used to punish "fighting words" *or any other words that*
> *by themselves have the effect of physically obstructing or interfering with a*
> *police officer in the performance of his duties*—e.g., the statute may be
> used to punish a person who runs beside an officer pursuing a felon in a
> public street shouting and cursing at the officer if the shouting and cursing
> physically obstructs the officer's pursuit and if the person intends by his
> conduct to obstruct or interfere with the officer.  *However, the statute does*

---

[20] To be clear, the Officers did not have probable cause to arrest Hoyland for obstruction.
This was decided by Judge Perkkio when she dismissed the criminal charge against
Hoyland.  Defendants will not be allowed to argue that the Officers actually had probable
cause at trial.  The focus will be on whether the Officers' mistaken belief they had probable
cause to arrest Hoyland for obstruction was objectively reasonable (i.e., if the Officers had
arguable probable cause).

> *not apply to ordinary verbal criticism directed at a police officer even while*
> *the officer is performing his official duties and does not apply to the mere*
> *act of interrupting an officer, even intentionally.*

Id. at 877–78 (citations omitted) (emphases added).

The Minnesota Supreme Court later described these comments in Krawsky as dictum.  See State v. Tomlin, 622 N.W.2d 546, 549 (Minn. 2001).  However, the Court did not forswear this standard.  See id.  Instead, it concluded that although the defendant's lies to investigators "may have lengthened the time it took the police to apprehend" the suspects, they "did not physically prevent or obstruct the police from trying to obtain the evidence," and thus those lies could not serve as the basis for a charge of obstruction.  Id.  The Court held that obstruction required "a finding that the accused physically obstructed or interfered with a police officer while that officer was engaged in the performance of his official duties."[21]  Id.

The issue before this Court then is whether the Officers' mistaken belief that they had probable cause to arrest Hoyland for obstruction was objectively reasonable in light of this law and the circumstances surrounding Hoyland's arrest.  Answering this question, however, requires resolving genuine issues of material fact in dispute.  For instance, the parties disagree about whether Hoyland intended to interfere with the Officers' performance of their duties.  Similarly, the parties disagree about whether Hoyland's

---

[21] Hoyland construes the case law to require that "some physical act that interferes or obstructs an officer in the performance of their official duties must accompany verbal conduct that is not 'fighting words' . . . ."  (See Pl.'s Mem. in Opp. at 13–14.)  The Court disagrees.  The Minnesota Supreme Court in Krawsky plainly stated that the obstruction statute "may be used to punish 'fighting words' *or any other words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties* . . . ."  426 N.W.2d at 877 (emphasis added).

conduct "substantially frustrated" or "merely interrupted" the Officers in their duties.  A jury must resolve these disputes and assess the objective reasonableness of the Officers' mistaken belief that they had probable cause to arrest Hoyland.  See Giordano v. Lee, 434 F.2d 1227, 1230 (8th Cir. 1970) ("[I]n [claims under 42 U.S.C. § 1983], where a genuine issue of fact on the existence of probable cause for arrest is presented, the question should be submitted to the jury."); Hoffmeyer v. Porter, 758 F.3d 1065, 1068 (8th Cir. 2014) (citing Giordano with approval and upholding a district court's decision to put the issue of probable cause to a jury); Sang v. City of St. Paul, No. 09-cv-455 (RHK/SRN), 2010 WL 2346600, at *4 (D. Minn. June 8, 2010) (denying summary judgment because of disputed questions of material fact related to the existence of arguable probable cause); Jacobson v. Mott, No. 07-cv-4420 (DWF/RLE), 2009 WL 1562772, at *5 (D. Minn. June 3, 2009), aff'd, 623 F.3d 537 (8th Cir. 2010) (holding that a jury needed to decide whether arguable probable cause existed and assess the objective reasonableness of the officers' actions in light of the facts).

### C. Hoyland's Section 1983 First Amendment Retaliatory Arrest Claim

Defendants seek summary judgment on Hoyland's § 1983 First Amendment retaliatory arrest claim.  (See Defs.' Mot.)  Again, they contend the Officers are entitled to qualified immunity.  (See Defs.' Mem. in Supp. at 23.)  Defendants also allege that Hoyland failed to produce evidence establishing each of the elements of a First Amendment retaliatory arrest claim.  (See Defs.' Reply at 5–11.)

To sustain a First Amendment retaliatory arrest claim under § 1983, a plaintiff must show that: (1) he engaged in a protected activity, (2) a government official acted

against him in a way that would "chill a person of ordinary firmness from continuing in the activity," (3) the government's adverse act was motivated at least in part by the plaintiff engaging in the protected activity, and (4) the government official lacked at least arguable probable cause to arrest the plaintiff.   Peterson v. Kopp, 754 F.3d 594, 602 (8th Cir. 2014).

### 1.   The Protected Activity

Defendants argue that the right to film police conducting a traffic stop was not clearly established at the time of Hoyland's arrest and thus they are entitled to qualified immunity.  (See Defs.' Mem. in Supp. at 15–20.)  Hoyland contends that his § 1983 First Amendment claim is not so narrow in terms of the rights it implicates.  (See Pl.'s Mem. in Opp. at 18–24.)   Specifically, Hoyland argues that his protected right to verbally engage with and criticize the police, which was clearly established at the time of his arrest, is also encompassed by his claim.  (See id. at 23–24.)

Numerous federal circuit courts of appeals have recognized a general First Amendment right to record police performing their duties in public, subject to certain limitations.  Am. Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583, 595–96 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995).   Whether this right extends to the filming of traffic stops is unsettled.   In general, because of the danger to officers and the public, police are given wide latitude in how they manage traffic stops.  See Arizona v. Johnson, 555 U.S. 323, 330 (2009) (recognizing that traffic stops are "especially fraught with danger" for both officers and

occupants of the stopped vehicle and holding that "[t]he risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation." (alterations in original) (quotations omitted)).   Only one federal circuit court of appeals has explicitly recognized a right to film officers conducting a traffic stop.  See Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014); but see Kelly v. Borough of Carlisle, 622 F.3d 248, 262 (3d Cir. 2010) (no clearly established right to film police during a traffic stop).  The Eighth Circuit has yet to address whether the First Amendment encompasses such a right.

It is unnecessary for this Court to decide whether a right to film police conducting a traffic stop exists under the First Amendment.  Even assuming it does, it was not well-established at the time of Hoyland's arrest, which occurred before any clear judicial precedent setting forth that right.  However, this does not resolve whether Defendants are entitled to qualified immunity against Hoyland's § 1983 retaliatory arrest claim.  As Hoyland notes, that claim also implicates his First Amendment right to verbally engage and criticize the Officers.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."  Hartman v. Moore, 547 U.S. 250, 256 (2006) (citations omitted).  The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers."  City of Houston, Tex. v. Hill, 482 U.S. 451, 461 (1987).  Verbal conduct directed at police, not consisting of "fighting

words" or amounting to obstruction, is protected speech.[22]  See id. at 461–63; Lewis v. City of New Orleans, 415 U.S. 130, 133–34 (1974).  The right to speak out without government retaliation was clearly established at the time of Hoyland's arrest in May of 2013.  See Baribeau, 596 F.3d at 481.

Thus, Defendants are not entitled to qualified immunity on the basis that Hoyland's First Amendment right was not clearly established.  At a minimum, Hoyland's right to verbally engage and criticize the Officers was clearly established at the time of his arrest.

Defendants also argue that the Officers' orders to Hoyland that he go inside were reasonable time, place, and manner restrictions—meaning Hoyland's continued verbal engagement of the Officers after those commands were given was not a protected activity under the First Amendment.  (See Defs.' Mem. in Supp. at 20–23.)  Hoyland contends that those orders were not reasonable under the circumstances because they eliminated his ability to exercise his First Amendment right.  (See Pl.'s Mem. in Opp. at 23–24.)

"Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions."  Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).  "Time, place, and manner regulations are constitutional under First Amendment jurisprudence if (1) they 'are justified without reference to the content of the regulated speech,' (2) 'they are narrowly tailored to serve a

---

[22] Since the First Amendment affords citizens the right to criticize police conduct, it logically also protects their ability to inform officers of important information related to the officers' duties and public safety—like Hoyland's attempt to notify the Officers of his wife's disability.

23

significant governmental interest,' and (3) 'they leave open ample alternative channels for communication of the information.'" Excalibur Grp., Inc. v. City of Minneapolis, 116 F.3d 1216, 1220 (8th Cir. 1997) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

The Court cannot conclude that the Officers' orders to Hoyland were reasonable time, place, and manner restrictions to warrant qualified immunity for two reasons. First, these orders did not leave Hoyland *any* alternative channel to communicate his concerns about his wife or his displeasure with how the Officers were conducting the stop. Hoyland was worried about his wife's safety because of her physical disability, which was not readily apparent and prevented her from complying with the Officers' commands. Waiting inside until after the Officers took Christina into custody was not an alternative because it denied Hoyland the chance to communicate that information when it mattered—while the Officers were attempting to take Christina into custody.

Second, the Officers' orders were not narrowly tailored to serve a significant governmental interest. There is no doubt that a police officer's ability to secure a scene—protecting the safety of the public and the officer—is a significant government interest. See Colten v. Kentucky, 407 U.S. 104, 109–10 (1972) (describing the government's interest in ensuring public safety at the scene of a traffic stop involving numerous vehicles, officers, and individuals). However, that interest must be assessed in the context of the restrictive measure employed and the circumstances present at the time. See Ward, 491 U.S. at 799 (holding that time, place, and manner restrictions "may not burden substantially more speech than is necessary to further the government's legitimate

interests"); Ass'n of Cmty. Organizations for Reform Now v. St. Louis Cty., 930 F.2d

591, 595 (8th Cir. 1991) ("To justify any intrusion at all [on First Amendment rights]

there must be a threshold showing that the factual situation demonstrates a real need for

the government to act to protect its interest.").  As one court succinctly stated:

> It goes without saying that the police may take all reasonable steps to
> maintain safety and control, secure crime scenes and accident sites, and
> protect the integrity and confidentiality of investigations.  While an officer
> surely cannot issue a "move on" order to a person because he is [exercising
> a protected First Amendment right], the police may order bystanders to
> disperse for reasons related to public safety and order and other legitimate
> law-enforcement needs.

Alvarez, 679 F.3d at 607; see also McDermott v. Royal, 123 F. App'x 241, 243 (8th Cir.

2004) (holding there was a viable § 1983 First Amendment retaliatory arrest claim where

a plaintiff refused to obey the officers' commands that she go inside and instead remained

on her front porch "harassing and otherwise annoying the police" who were attempting to

search a vehicle on her property).

Here, the scene was a residential driveway in a suburban neighborhood (i.e., not

an inherently dangerous scene like a busy highway or a known high-crime area), where

four officers were conducting a traffic stop after a short, slow-speed chase.  When

Hoyland emerged from his home, the driver of the vehicle was in custody and the

passenger was at gun point.  No one acted violently or attempted to flee and everyone, for

the most part, complied with the Officers' orders.  Hoyland never left the doorway of his

home, 30 or more feet away from the Officers.  At least one of the Officers immediately

identified the object in Hoyland's hand as a camera and announced this fact to the others.

These undisputed facts indicate that the scene was largely secure.  The Officers'

commands that Hoyland go back inside did little to further their interest in securing the scene.  On these facts, the Court cannot conclude as a matter of law that the Officers' orders, which foreclosed Hoyland's ability to communicate important information when it mattered, were narrowly tailored to serve a significant government interest.

## 2.   The Chilling Effect

Defendants argue that the Officers' commands to Hoyland would not have chilled a person of ordinary firmness from engaging in an activity protected by the First Amendment.  (See Defs.' Reply at 9–10.)  The Court disagrees.  It is not just the chilling effect of the Officers' orders that must be considered, but also Hoyland's subsequent arrest when he did not comply with those orders.  The Officers' orders, combined with their arrest of Hoyland, would chill a person of ordinary firmness from verbally engaging the Officers as Hoyland did.  See Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) (holding that receiving multiple parking tickets would impermissibly chill protected speech and declaring that, "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).

## 3.   The Officers' Motivation

Defendants claim that the Officers' acts in ordering Hoyland to go back inside and subsequently arresting him for obstruction were not motivated by Hoyland exercising his First Amendment rights.  (See Defs.' Reply at 10–11.)  Hoyland disagrees, arguing that "[t]he officers' orders that [Hoyland] go inside and that he drop the 'camera' are further

proof that their motivation was to stop him exercising his constitutional rights." (Pl.'s Mem. in Opp. at 26.)

To sustain a § 1983 First Amendment retaliatory arrest claim, "a plaintiff must show that the retaliatory motive [of the government actor] was a 'substantial factor' or 'but-for cause' of the adverse action." Peterson, 754 F.3d at 602 (quoting Baribeau, 596 F.3d at 481). Stated another way, a plaintiff must show he was "singled out" because he exercised a constitutional right. Baribeau, 596 F.3d at 481. Whether this causal connection exists is generally a jury question. Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).

The McDermott case offers a useful comparison. There, police arrived at the plaintiff's ("McDermott") house in the early morning to arrest her son on charges of driving while intoxicated. McDermott v. Royal, 123 F. App'x 241, 242 (8th Cir. 2004) (unpublished per curiam) (hereinafter, McDermott I). When McDermott realized what was happening, she stepped onto her front porch and began to "harass or otherwise annoy the police, telling them they had no right to search her son's vehicle without a warrant and that they should leave her private property." Id. at 242–43. However, she never engaged in any force or violence against the police, nor did she leave her porch. Id. at 243. The police ordered McDermott to be quiet and go back inside, but she refused, and the police arrested her for obstruction. Id.

McDermott brought a § 1983 action against the officers based on her arrest. Id. at 242. The district court construed her complaint as asserting claims for excessive force, false arrest, malicious prosecution, and intentional infliction of emotional distress. Id.

27

The district court dismissed all these counts on summary judgment and McDermott appealed. Id. The Eighth Circuit affirmed the district court's dismissal of McDermott's claims, but also held that "[u]nder these circumstances, we believe that McDermott has raised a viable (if not ultimately successful) claim that her First Amendment rights were violated insofar as she was arrested, charged, and prosecuted for the mere verbal harassment of the Defendant police officers." Id. at 243.

On remand, the district court held an evidentiary hearing where the police presented evidence that McDermott's conduct had agitated and distracted a drug-sniffing dog the officers were using to search a vehicle. McDermott v. Royal, 213 F. App'x 500, 501–02 (8th Cir. 2007) (unpublished per curiam) (hereinafter, McDermott II). Based on this evidence, the district court concluded that "the First Amendment did not give McDermott the right to obstruct an officer from performing his duty and to jeopardize the safety of others by agitating a police dog," and granted summary judgment in favor of the officers. Id. at 502. McDermott appealed and the Eighth Circuit reversed the district court, holding that McDermott's right to a jury trial was violated. Id. Specifically, the Eighth Circuit held that, despite the fact that McDermott distracted the drug-sniffing dog by shouting, yelling profanities, and waving her arms, her conduct did not amount to fighting words outside the protection of the First Amendment. Id.

On remand the second time, the district court conducted a jury trial on McDermott's § 1983 First Amendment claim. See McDermott v. Royal, 613 F.3d 1192, 1193 (8th Cir. 2010) (hereinafter, McDermott III). The jury returned a verdict in favor of the officers, finding that "McDermott's protected speech was not a substantial or

motivating factor in her arrest and that she was not arrested for mere speech."[23]  Id. at
1193.

The Court finds that Hoyland "has raised a viable (if not ultimately successful)
claim that [his] First Amendment rights were violated insofar as [he] was arrested,
charged, and prosecuted for the mere verbal harassment of the Defendant police officers."
See McDermott I, 123 F. App'x at 243.  The Officers' commands to Hoyland to go inside
were similar to those given by the police in McDermott under similar circumstances.  See
id.  Moreover, the Officers repeatedly mentioned Hoyland's refusal to go inside when
they discussed the reasons for his arrest.  See supra Part II.C.  A jury must decide whether
Hoyland's evidence proves that his verbal engagement of the Officers was a "substantial
factor" in the Officers' adverse actions against him.  See Ricketts v. City of Columbia,
Mo., 36 F.3d 775, 779 (8th Cir. 1994) ("Causation is generally a jury question unless, in a
particular case, the question is so free from doubt as to justify taking it from the jury."
(quotations omitted)).

### 4.  Arguable Probable Cause

As described above, genuine issues of material fact preclude finding as a matter of
law that the Officers had arguable probable cause to arrest Hoyland.

### D.  Hoyland's Malicious Prosecution Claim

Defendants argue that Hoyland's state law claim for malicious prosecution fails
because the Officers acted with arguable probable cause and there is no indication of

---

[23] The district court went on to find that the obstruction ordinance McDermott was
prosecuted under was unconstitutionally broad, a holding the Eighth Circuit overturned
on appeal.  See McDermott III, 613 F.3d at 1193–94.

malice in their arrest of Hoyland.  (See Defs.' Mem. in Supp. at 26–28.)  Similarly, they allege that because there is no evidence of maliciousness, the Officers are entitled to official immunity and the City of Rosemount ("Rosemount") is entitled to vicarious official immunity.  (See id. at 28–32.)  Hoyland contends that the Officers' malice is apparent by the fact that they lacked even arguable probable cause to arrest him and thus they are not entitled to official immunity.  (Pl.'s Mem. in Opp. at 28–32.)

Malicious prosecution claims are generally disfavored under Minnesota law and thus are "carefully circumscribed."  Bahr v. Cty. of Martin, 771 F. Supp. 970, 979–80 (D. Minn. 1991) (quoting Lundberg v. Scoggins, 335 N.W.2d 235, 236 (Minn. 1983)).  Public policy favors prosecutions undertaken in good faith.  See Lundberg, 335 N.W.2d at 236.  "Under Minnesota law, the tort of malicious prosecution includes four elements.  The plaintiff must prove that: (1) the defendant initiated criminal proceedings (2) without probable cause and (3) with malice, and (4) the proceedings terminated in the plaintiff's favor."  Young v. Klass, 776 F. Supp. 2d 916, 922 (D. Minn. 2011).

Malice is a state of mind which must be proven as a fact.  Allen v. Osco Drug, Inc., 265 N.W.2d 639, 645 (Minn. 1978) (quoting Hanowitz v. Great N. Ry. Co., 142 N.W. 196, 197 (Minn. 1913)).  "[M]alice may be, but need not be, inferred from lack of probable cause."  Id. at 645.  Government officials might lack the probable cause necessary to arrest and charge an individual, but not have the malicious state of mind necessary to sustain a claim for malicious prosecution.  See Hanowitz, 142 N.W. at 197 ("Want of probable cause may exist without malice.").

Hoyland's only "evidence" of the Officers' malicious intent is his belief that "no

reasonable officer could have believed there was lawful a [sic] basis to arrest [Hoyland],"
under the circumstances.[24]  (Pl.'s Mem. in Opp. at 29–30.)  However, by itself and under
these circumstances, this is not evidence of malice.  Even if the Officers' mistaken belief
they had probable cause to arrest Hoyland was objectively unreasonable, this does not
equate to malicious intent.  See Allen, 265 N.W.2d at 645; Hanowitz, 142 N.W. at 197.
Since Hoyland presents no other evidence that the Officers acted with malice in arresting
him for obstruction, the Court dismisses Hoyland's malicious prosecution claim.

## IV.   CONCLUSION

Hoyland's 42 U.S.C. § 1983 unlawful search claim against Coughlin is dismissed
by agreement of the parties.  Hoyland's malicious prosecution claim is dismissed because
there is no evidence the Officers maliciously charged him with obstruction.  However,
genuine issues of material fact preclude the Court from granting summary judgment on
Hoyland's § 1983 claims for unreasonable seizure and First Amendment retaliatory
arrest.

## V.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS
HEREBY ORDERED** that:

1.  Plaintiff's Motion for Partial Summary Judgment [Doc. No. 22] is **DENIED**.

---

[24] Hoyland also contends that the fact Eckstein issued him the citation on the basis of
what he was told by the other Officers, not because of what Eckstein himself witnessed,
evidences malice.  (Pl.'s Mem. in Opp. at 29.)  This assertion is without merit.  "When
multiple officers are involved in an investigation, probable cause may be based on their
collective knowledge and need not be based solely on the information within the
knowledge of the arresting officer as long as there is some degree of communication."
United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011).

2. Defendants' Motion for Summary Judgment [Doc. No. 16] is **DENIED IN PART AND GRANTED IN PART** as follows:

   a. Plaintiff's 42 U.S.C. § 1983 claim against Defendant Coughlin for unreasonable search (Compl., Count III [Doc. No. 1]) is **dismissed with prejudice**.  Defendant Coughlin is **dismissed** from the case;

   b. Plaintiff's malicious prosecution claim (Compl., Count V) is **dismissed with prejudice**; and

   c. Defendants' Motion for Summary Judgment is otherwise **denied**.

Dated:  May 5, 2016

<u>s/ Susan Richard Nelson</u>
SUSAN RICHARD NELSON
United States District Judge