UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian Thomas Hoyland,<br><br>   Plaintiff,<br><br>v.<br><br>Shawn McMenomy, individually and in his official capacity; Henry Cho, individually and in his official capacity; Alex Eckstein, individually and in his official capacity; Ryan Coughlin, individually; and the City of Rosemount.<br><br>   Defendants. | Court File No. 14-cv-02977 SRN/KMM<br><br>**PLAINTIFF'S TRIAL BRIEF** |

COMES NOW plaintiff, Brian Hoyland, by and through the undersigned counsel, and pursuant to the Amended Trial Notice and Final Pretrial Order (Doc. No. 59), hereby submits his trial brief.

## 1. Trial counsel.

 Frederick J. Goetz
 615 1st Avenue NE, Suite 425
 Minneapolis, MN 55431
 (612) 874-1552
 fgoetz@goetzeckland.com

2. **Jury/Non-jury.**

Both parties have demanded a jury trial. The case is therefore to be tried to a jury.

3. **Length of trial.**

Plaintiff estimates that the length of the trial, including jury selection and jury charge, will be three full trial days.

4. **Jurisdiction.**

This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the Fourth Amendment to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§1331, 1343(a)(3) and (4) and 1367(a) and the aforementioned statutory and constitutional provisions.

5. **Facts.**

Brian Thomas Hoyland, his wife, Christina, and their three children live in Rosemount, Minnesota. The family's home is on Brass Parkway which is a quiet street with well-kept homes in a peaceful development. Mr. Hoyland was home along with his children in the early morning hours of May 8, 2013. Though his bedroom is in the back of the house, at approximately 1:34 a.m. he was awoken by the sound of loud voices and yelling coming from the front of his home. Mr. Hoyland got up, walked to his children's bedroom, which was in the front of the house, looked out the front window, and was shocked by what he saw.

A number of police squad cars with their lights flashing and numerous police officers in uniform with their guns drawn were shouting and yelling. When Mr. Hoyland heard the word "shoot," he was concerned for his children's safety and brought them to the back bedroom.

Mr. Hoyland then grabbed his smartphone, went downstairs, and looked out the front window on the first floor of his home to see what was going on. Mr. Hoyland could see the officers' guns and noticed that they were pointed towards a vehicle in his driveway. Mr. Hoyland recognized Mark Illetschko, a friend of his wife's, in handcuffs speaking with one of the officers. Christina Hoyland had gone out earlier in the evening. Mr. Hoyland was able to hear the police officers continue to say "shoot" and "shooting" while at the same time heard his wife's voice telling the officers that she could not comply because she was physically unable to do what they were asking her to do. Hoyland knew that Christina suffered from a chronic medical condition that left her disabled and partially paralyzed. Based upon the officers escalating tone of their commands, Mr. Hoyland became very concerned for his wife's safety. He felt he had to do something or the officers would shoot his wife for not doing what she was physically unable to do.

Mr. Hoyland decided he had to go outside and convey his wife's handicap to the officers. Before he did so, he turned on his front porchlight so the officers could realize that someone was coming out and also see that he was unarmed

3

and was not a threat when he opened his front door. By turning on his front light, Mr. Hoyland also wanted to let the police officers know that there were people in the home who were potential innocent targets. Mr. Hoyland made sure that the light in his front doorway was on before he went outside. Mr. Hoyland had his smartphone with him so he could document what was happening.

The officers knew almost immediately that Mr. Hoyland posed no threat to them. Sgt. Henry Cho in particular yelled out to Mr. Hoyland "drop the camera." Other officers quickly determined that the object in his hand was a cellphone. Nonetheless, the officers continued to order Mr. Hoyland to go inside his house.

Once he stepped onto his front doorway, Mr. Hoyland always made sure that he remained at his front door. Mr. Hoyland has his hands out stretched and the only thing he was holding was his cellphone. Mr. Hoyland voiced his concerns about the officers' escalating conduct and tried to inform them that his wife was physically handicapped and that they should not shoot her for doing what she was unable to do.

No sooner did Mr. Hoyland step onto his front porch then one of the officers, Shawn McMenomy, told him to go back inside the house. Mr. Hoyland did not do so as if he did go inside he would not be able to voice his concerns to the officers and thereby protect his wife from getting shot. While all Mr.

4

Hoyland was doing was standing in his doorway some 30 to 40 feet away from the officers, voicing his concerns about their conduct and his wife's physical handicap and video recording their actions; within less than 30 seconds of Hoyland's opening his front door Officer McMenomy told him that he was under arrest. While Mr. Hoyland questioned how he could be under arrest when he did not do anything wrong, he never physically resisted Officer McMenomy or Sergeant Henry Cho when they approached him and took him in custody.

At the time Mr. Hoyland was told he was under arrest the scene in front of his house was largely secure. The officers had come to the Hoyland residence after Officer McMenomy, responding to a call of squealing tires at an intersection some distance from the Hoyland home, had seen Mr. Illetschko's Corvette. Officer McMenomy thought the Corvette might be associated with the squealing tires and began to follow it. When he saw the tires of the Corvette touch the dividing line of a roadway, he turned on his overhead lights and activated his siren to pull the vehicle over. When Mr. Illetschko did not pull over right away, Officer McMenomy radioed to other Rosemount police officers that the vehicle was not stopping. After a distance of approximately one quarter mile and a time period of 29 seconds, Mr. Illetschko did pullover into the Hoylands' driveway.

5

At the time Hoyland came out his front door, however, Illetschko had fully cooperated with the officers from the moment his vehicle stopped and was in custody in handcuffs in the back of a Rosemount squad car. Hoyland's wife Christina was largely compliant with the officers demands, though she was upset to the point of swearing, as the officers were not listening to her when she was trying to tell them that she was physically unable to do what they were demanding that she do and threatening to shoot her if she did not comply.

At no time did Hoyland do anything to obstruct or interfere with any Rosemount police officer in the performance of their official duties. He never did anything to interfere or obstruct with the arrest of Mark Illetschko or the detention of Christina Hoyland. He never verbally said anything that would interfere with the officers in the performance of their duties such as telling either Illetschko or Christina not to comply with the officers demands. At all times he remained standing in his doorway at least 30 to 40 feet away from any officer or any other person at the scene.

Once Mr. Hoyland was arrested he was put in the back of a Rosemount squad car. While there, one of the officers spoke with him and threatened and demeaned him.

Hoyland was then placed in another squad car where he was interviewed by Officer Alex Eckstein. Hoyland was detained at the scene for approximately an hour. Though he was ultimately released, Officers McMenomy and

Eckstein as well as Sergeant Cho collectively issued a citation for the offense of obstruction of legal process. As a result of this unreasonable arrest, Hoyland was forced to retain a criminal defense lawyer. He spent approximately $1,500 in legal fees and was forced to appear multiple times in court. Ultimately, the criminal charge against him was dismissed for lack of probable cause by a judge of Dakota County District Court. The charges of driving under the influence of alcohol against Mark Illetschko were also dismissed by order of a Dakota County District Court judge who found that Officer McMenomy's initial traffic stop of Mr. Illetschko was unreasonable as there was no reasonable basis to suspect Mr. Illetschko of engaging in any criminal conduct or traffic offense.

In addition to the attorney fees for his criminal defense attorney, Hoyland will prove that he suffered humiliation, anger, short term feelings of despondency as well as minor and short term physical effects, such as loss of sleep as a result of the officers' conduct.

### 6. Plaintiff's claims.

Plaintiff claims that defendants McMenomy, Cho and Eckstein are liable under 42 U.S.C. §1983 in two ways.

First, they violated Mr. Hoyland's right to be free from unreasonable seizure in violation of the Fourth Amendment to the United States Constitution. Second, they retaliated against him for engaging in activity

7

protected by the First Amendment specifically criticizing their conduct and video recording their actions.

## 7. Unresolved issues.

### a. *Substantive issues.*

Plaintiff's claim in Count I alleging a false arrest in violation of the Fourth Amendment has three elements:

1. Defendants arrested plaintiff,
2. Defendants did not have probable cause to arrest the plaintiff, and
3. Defendants were acting under color of law.

*Baribeau v. City of Minneapolis,* 596 F.3d 465, 478 (8th Cir. 2010). Plaintiff anticipates that the first and third elements of this count will not be in dispute. Plaintiff expects the defendants will contend they had probable cause to believe that Mr. Hoyland violated Minnesota's obstruction of legal process statute under Minn. Stat. §609.50, subd. 1(2).

In framing the arrest without probable cause element, the United States District Court is bound by the decisions of the Minnesota Supreme Court. *Baribeau,* 596 F.3d at 475. The leading case interpreting and narrowly defining Minnesota's obstruction of legal process statute is *State v. Krawsky,* 426 N.W.2d 875 (Minn. 1988). The *Krawsky* court clarified when conduct amounts to criminal obstruction:

> First the statute requires the state to prove that the defendant acted "intentionally."…
>
> Second…as we interpret it, our statute is directed solely at physical acts….
>
> Third…as we interpret it, our statute is directed at a particular kind of physical act, namely, physically obstructing or interfering with an officer….(P)hysically obstructing or interfering with a police officer involves not merely interrupting an officer but substantially frustrating or hindering the officer in the performance of his duties.
>
> As we read our statute, the statute forbids intentional physical obstruction or interference with a police officer in the performance of his official duties. The statute may be used to punish "fighting words" or any other words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties— *e.g.,* the statute may be used to punish a person who runs beside an officer pursuing a felon in a public street shouting and cursing at the officer if the shouting and cursing physically obstructs the officer's pursuit and if the person intends by his conduct to obstruct or interfere with the officer….However, the statute does not apply to ordinary verbal criticism directed at a police officer even while the officer is performing his official duties and does not apply to the mere act of interrupting an officer, even intentionally.

*Krawsky,* 426 N.W.2d at 877-878.

Thus, essential elements of the offense of obstructing legal process under Minnesota law include, inter alia:

> [That] the defendant physical obstructed, resisted or interfered with a peace officer in the performance of official duties. "Physically obstructed, resisted or interfered with" means the words and acts of the defendant must have the effect of substantially frustrating or hindering the officer in the performance of the officer's duties.
>
> [And that] the defendant acted with the intention of obstructing, hindering or preventing the peace officer.

9

Minn. Prac. Series, Jury Instruction Guides–Criminal, CRIMJIG 24.26 (2016).

Any instruction that the Court gives as to the elements of the offense of obstruction of legal process under Minnesota law should include verbatim the language from the approved Minnesota criminal jury instruction which follows the direction of the Minnesota Supreme Court in *State v. Krawsky.*

While the defendants will argue that their arrest of Mr. Hoyland was constitutional as it was objectively reasonable for them to mistakenly believe that, under the totality of the circumstances, Hoyland was obstructing them in the performance of their official duties; they should be prohibited from doing so under the law-of-the-case doctrine. Plaintiff has raised this issue both in his renewed motion for partial summary judgment (Doc. No. 77) and in a motion in limine. (Doc. No. 71). Under the authority set forth in support of these motions, based upon the holding of the Eighth Circuit Court of Appeals in *Hoyland v. McMenomy,* 869 F.3d 644 (8th Cir. 2017); this Court should rule as a matter of law that the officers' mistaken belief that they had probable cause to arrest Hoyland for obstruction of legal process under Minnesota law was not objectively reasonable. The Court should therefore find that all three defendants are liable to plaintiff under Count I and the only remaining issue is what amount of damages should the plaintiff be awarded as a result of the Fourth Amendment violation.

Plaintiff's claim of First Amendment retaliatory arrest in Count II has four elements. Plaintiff must show:

1. He engaged in a protected activity;
2. The government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;
3. The adverse action was motivated at least in part by the exercise of the protected activity; and
4. Lack of probable cause or arguable probable cause.

*Hoyland,* 869 F.3d at 655.

The Eighth Circuit Court of Appeals has found that Hoyland's communications to the officers were protected activity. Id at 656. The Eighth Circuit also found that the officers' actions against Hoyland in arresting him "would chill a person of ordinary firmness" from exercising his right to free expression in the future. *Hoyland,* 869 F.3d at 656-657. Also, the Eighth Circuit has ruled as a matter of law that the officers lacked probable cause or arguable probable cause to arrest Hoyland. *Hoyland,* 869 F.3d at 657. Thus, as to the First Amendment retaliatory arrest claim, the only remaining issue to be determined by a jury is whether the officers' actions in arresting Mr. Hoyland were motivated at least in part by the exercise of his First Amendment protected activity.

b. *Evidentiary issues.*

Plaintiff will elect at trial not to offer any medical testimony, medical or psychological experts, or medical records in support of his damages claim. He

11

will not be making any claim that he suffered a specific psychological injury or specific mental disorder as a result of the incident. Because the plaintiff will thus be limiting his claim for emotional distress to a "garden variety" emotional distress claim, the defense should be precluded from offering plaintiff's medical or psychological records as exhibits or cross-examining the plaintiff based upon these records at trial. See *Ewald v. Royal Norwegian Embassy,* 2013 WL 12140175, p. 6 (D. Minn. 2013). The Court is respectfully referred to plaintiff's Motion in Limine to Prohibit Introduction of Psychological Evidence (Doc. No. 69) for further authority in support of this motion.

Respectfully submitted,

DATED: November 8, 2017

GOETZ & ECKLAND P.A.

By: *s/Frederick J. Goetz*
FREDERICK J. GOETZ (#185425)
Banks Building
615 First Avenue N.E., Suite 425
Minneapolis, MN 55413
(612) 874-1552

ATTORNEY FOR PLAINTIFF